UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

E.F. and J.F., individually and on behalf of F.F.,

        Plaintiffs,

     v.

NEW YORK CITY DEPARTMENT OF
EDUCATION,

        Defendant.

-------------------------------------------------------------

**MEMORANDUM & ORDER**

12-CV-2217 (MKB)

MARGO K. BRODIE, United States District Judge:

  Plaintiffs E.F. and J.F.[1] (the "Parents"), individually and on behalf of their minor son, F.F., bring this action against the New York City Department of Education ("DOE"), seeking "declaratory and reimbursement relief" pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* Plaintiffs seek review and reversal of the State Review Officer's ("SRO") order, which overturned the Impartial Hearing Officer's ("IHO") decision granting Plaintiffs reimbursement for private school pursuant to the IDEA. Plaintiffs move for summary judgment on their claims and DOE cross-moves for summary judgment. The Court heard oral argument on August 2, 2013. For the reasons set forth below, Plaintiffs' motion is denied and DOE's cross-motion is granted.

**I. Background**

  **a. Statutory Framework for IDEA Cases**

  Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs . . . [and] to

---

[1] E.F. is the mother, and J.F. the father, of F.F.

ensure that the rights of children with disabilities and parents of such children are protected."

*M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 223 (2d Cir. 2012) (alteration in original) (quoting

20 U.S.C. § 1400(d)(1)(A)-(B)).  The IDEA mandates that a "state receiving federal funds under

the IDEA must provide disabled children with a free and appropriate public education

('FAPE')."  *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174–75 (2d Cir. 2012), (citations

omitted), *cert. denied*, 569 U.S. ---, 133 S. Ct. 2802 (2013).  The goal of the IDEA is "[t]o ensure

that qualifying children receive a FAPE . . . ."  *R.E.*, 694 F.3d at 175.  To do so, it mandates that

"a school district must create an individualized education program ('IEP') for each [disabled]

child."  *Id.*; *see also* 20 U.S.C. § 1414(d).  "The IEP is 'a written statement that sets out the

child's present educational performance, establishes annual and short-term objectives for

improvements in that performance, and describes the specially designed instruction and services

that will enable the child to meet those objectives.'"  *R.E.*, 694 F.3d at 175 (quoting *D.D. ex rel.*

*V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir. 2006)).  The IEP is required to be

"reasonably calculated to enable the child to receive educational benefits."  *R.E.*, 694 F.3d at 175

(quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)); *see also M.H.*, 685 F.3d at 224.

"Under the IDEA, for a child's IEP to be adequate, it must be likely to produce progress, not

regression, and [must] . . . afford[ ] the student with an opportunity greater than mere trivial

advancement."  *M.H.*, 685 F.3d at 224 (alterations in original) (internal quotation marks omitted)

(quoting *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir.

2009))).  However, the IDEA does not require the IEP to "furnish every special service necessary

to maximize each handicapped child's potential."  *M.H.*, 685 F.3d at 224 (citations omitted).

"Rather, 'a school district fulfills its substantive obligations under the IDEA if it provides an IEP

that is likely to produce progress, not regression, and if the IEP affords the student with an

2

opportunity greater than mere trivial advancement.'" *A.H. ex rel. J.H. v. Dep't of Educ. of N.Y.C.*, 394 F. App'x 718, 721 (2d Cir. 2010) (quoting *T.P. ex rel. S.P.*, 554 F.3d at 254).

"In New York, the state has assigned responsibility for developing IEPs to local Committees on Special Education ('CSEs')." *R.E.*, 694 F.3d at 175 (citing N.Y. Educ. Law § 4402(1)(b)(1)). "CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." *R.E.*, 694 F.3d at 175 (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)). "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." *R.E.*, 694 F.3d at 175 (citations omitted). "If a parent believes that his child's IEP does not comply with the IDEA, the parent may file a 'due process complaint' (a type of administrative challenge unrelated to the concept of constitutional due process) with the appropriate state agency." *R.E.*, 694 F.3d at 175 (citations omitted); *see also* 20 U.S.C. § 1415(b)(6); *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, --- F.3d ---, ---, 2013 WL 3868594, at *1 (2d Cir. July 29, 2013). The due process complaint is heard by an IHO appointed by the school district. 20 U.S.C. § 1415(f); *R.E.*, 694 F.3d at 175; *M.H.*, 685 F.3d at 224; *see also* N.Y. Educ. Law § 4404(1). A party can appeal the IHO's decision to the SRO.[2] *R.E.*, 694 F.3d at 175; *see also* N.Y. Educ. Law

---

[2] The administrative hearings use the *Burlington/Carter* test to determine whether a parent should be reimbursed for a unilateral placement. *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, ---F.3d ---, ---, 2013 WL 3868594, at *1 (2d Cir. July 29, 2013); *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 185 (2d Cir. 2012). First, the school district must establish that the IEP was appropriate both procedurally and substantively. *R.E.*, 694 F.3d at 185; *see also Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998); *F.L. ex rel. F.L. v. N.Y.C. Dep't of Educ.*, No. 11-CV-5131, 2012 WL 4891748, at *6 (S.D.N.Y. Oct. 16, 2012). An IEP is appropriate substantively if the "IEP was 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak*, 142 F.3d at 129 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07 (1982)); *see also A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009); *F.L. ex rel. F.L.*, 2012 WL 4891748, at *6. If the school district fails it burden, the next step in

§ 4404(2); *M.W. ex rel. S.W.*, --- F.3d at ---, 2013 WL 3868594, at *1. After the SRO has

rendered a decision, a party can "then bring a civil action in state or federal court to review the

SRO's decision." *R.E.*, 694 F.3d at 175 (citations omitted); *see also* 20 U.S.C. § 1415(i)(2)(A);

*M.W. ex rel. S.W.*, --- F.3d at ---, 2013 WL 3868594, at *1. "When such an action is brought in

federal district court, the court reviews the records of all of the prior administrative hearings and

must hear additional evidence if so requested by either of the parties." *M.H.*, 685 F.3d at 225

(citing 20 U.S.C. § 1415(i)(2)(c)).

### b.  F.F.'s General Background

F.F. has been diagnosed with "Autism Spectrum Disorder, cerebral palsy-hypotonic,

strabismus, and perventicular lukomalacia ['PVL'] (a neurological condition characterized by

brain lesions and low white matter resulting in significant brain damage)." (Pls. 56.1 ¶ 3.)

"Additionally, F.F. has mobility limitations uses leg braces and a walker, and has blind spots in

his vision." (*Id.*) Prior to 2007, F.F. "received Early Intervention Services and then attended

United Cerebral Palsy." (*Id.* ¶ 4.) In 2007, F.F. began to attend the Rebecca School. (*Id.* ¶ 5.)

In April 2008, the Rebecca School issued a multidisciplinary progress report which summarized

F.F.'s educational performance from January 2009 to April 2009. (Ex. J; *see also* SRO

Decision 2.)

---

the test requires the parents of the child to establish the appropriateness of the private school
placement. *See Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 12–
13 (1993); *P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ., (Region 4)*, --- F. App'x ---, ---, 2013 WL
2158587, at *3 n.5 (2d Cir. May 21, 2013); *B.R. ex rel. K.O. v. N.Y.C. Dep't of Educ.*, No. 11-
CV-8433, 2012 WL 6691046, at *8 (S.D.N.Y. Dec. 26, 2012); *E.T. v. Bd. of Educ. of Pine Bush
Cent. Sch. Dist.*, No. 11-CV-5510, 2012 WL 5936537, at *13 (S.D.N.Y. Nov. 26, 2012). Lastly,
the parents must establish that the equities favor reimbursement of the private school education
and the level of reimbursement. *See Florence Cnty. Sch. Dist. Four*, 510 U.S. at 12–13; *P.K. ex
rel. S.K.*, --- F. App'x at ---, 2013 WL 2158587, at *3 n.5; *B.R. ex rel. K.O.*, 2012 WL 6691046,
at *8; *E.T.*, 2012 WL 5936537, at *13.

On April 1, 2009, the Parents executed an enrollment contract with the Rebecca School and remitted a deposit to reserve a place at the school for F.F. for the 2009–2010 school year. (SRO Decision 2; Parent Ex. M, O.)[3]  The deposit was $10,000, of which $2,500 was nonrefundable.  (Def. 56.1 ¶ 31; Tr.[4] 528:18–529:1, 534:17–18; Ex. M.)

On June 2, 2009, DOE special education teacher Bryna Levine conducted a 40-minute classroom observation of F.F. at the Rebecca School.  (Pls. 56.1 ¶ 6; SRO Decision 2.)  Levine "reported . . . that F.F. 'needs assistance with all activities due to very considerable fine and gross motor difficulties.'"  (Pls. 56.1 ¶ 6; *see also* Ex. G at 2–3.)

### c.  Committee on Special Education Meeting

On June 5, 2009, in preparation for the 2009–2010 school year, DOE held an annual meeting of the CSE to create an IEP for then-six-year-old F.F.  (*Id.* ¶ 7; Def. 56.1 ¶¶ 3–4.)  The CSE included the Parents, DOE school psychologist Rose Fochetta, DOE special education teacher/district representative Feng Ye and F.F.'s Rebecca School special education teacher Karin Robertson, who participated by telephone.  (Pls. 56.1 ¶¶ 5, 7.)  "Ms. Fochetta never met or observed F.F." but, Fochetta had been to the Rebecca School and observed other students in its program.  (*Id.* ¶ 8; Tr. 233:13–234:4.)  Ye had never taught students with autism.  (Pls. 56.1 ¶ 8.) As part of the process, the group reviewed documents, including "a Multi-disciplinary Report update prepared by the Rebecca School, dated April 2009; a report of a classroom observation of F.F. conducted on June 2, 2009; a psychological evaluation, dated July 28, 2008; and [F.F.'s] prior IEP" for the 2008–2009 school year.  (Def. 56.1 ¶ 6; *see also* Pls. 56.1 ¶ 9; Tr. 212:12–24.)

---

[3]  The exhibits from the Parents are labeled by letter, were submitted to the IHO and the SRO as part of the administrative hearing process and are labeled "Ex." hereinafter.

[4]  "Tr." refers to the transcript from the hearing before the IHO.

According to DOE, "every word of the IEP was discussed at the CSE meeting and everyone, including the Parents (who were familiar with the CSE process), provided input at the meeting." (Def. 56.1 ¶ 8 (citations omitted); *see also* Tr. 219:16–220:3, 222:23–223:3, 224:21–23, 445:24–456:23, 483:22–484:1, 531:23–532:7.)  DOE also maintains that "the CSE team specifically discussed how F.F. dealt with significant impairments, and specifically PVL, which impacts his functioning globally; how he was both non-verbal and non-ambulatory; and that academics were 'at a minimum' for F.F. and was not an area being focused on as he was not yet demonstrating 'readiness skills.'"  (Def. 56.1 ¶ 9.)

### d.  The Individualized Education Program

The IEP recommended that F.F. "be placed in a special class in a specialized school for a twelve month school year, with a ratio of six students to one teacher with one classroom paraprofessional" (referred to as "6:1:1").  (Def. 56.1 ¶ 11; *see also* Pls. 56.1 ¶ 10; Ex. B.)  The IEP also provided for the use of sensory tools, special seating and a paraprofessional specifically assigned to F.F. in order to provide one-on-one adult support.  (Ex. B at 3.)  The IEP further provided for F.F. to receive one-on-one occupational therapy ("OT") for five sessions each week for 30 minutes each session, one-on-one physical therapy ("PT") for five sessions each week for 30 minutes each session and one-on-one speech and language therapy for five sessions each week for 30 minutes each session.  (*Id.* at 2.)  The IEP also included 12 annual goals that were associated with 26 short-term objectives.  (*Id.* at 6.1–6.7; *see also* SRO Decision 18.)  The goals and objectives were discussed at the CSE meeting and many of the goals and objectives were based on the reports from the Rebecca School about F.F.  (*See* Tr. 227:3–228.6, 429:14–433:23, 455:24–456:10.)  The IEP did not include a behavioral intervention plan ("BIP") based on a

functional behavioral assessment ("FBA").  (*See generally id*.)  There was also no provision for parental counseling or training.  (*Id.*)

### e.  DOE's Placements

In a notice dated June 12, 2009, the DOE informed the Parents of the CSE meeting summary and offered F.F. a placement at P369K@P067K school ("first placement") to implement F.F.'s IEP for the 2009–2010 school year.  (Def. 56.1 ¶ 27; SRO Decision 2; Ex. F.)  According to Plaintiffs, E.F. visited the first placement and learned that it was located on the fourth and fifth floors in a building without an elevator.  (Pls. 56.1 ¶ 19; Tr. 513:3–514:5; Ex. E.)  After viewing the first placement, the Parents informed DOE in writing that they were rejecting the first placement and would continue F.F.'s enrollment at Rebecca School but would consider other options.  (Def. 56.1 ¶ 28; Ex. E.)

On June 25, 2009, DOE informed Plaintiffs by telephone that there was a second placement at PS771@P329 ("second placement").  (Pls. 56.1 ¶ 20; Def. 56.1 ¶ 29; SRO Decision 2.)  E.F. immediately tried to schedule a visit to the school, but she was told to call back on July 6, 2009.  (Pls. 56.1 ¶ 20; Ex. A at 3; Ex. D at 1.)  The Parents then wrote to DOE to inform DOE that they would not place F.F. in the second placement until they had visited the location, until that time they would continue F.F.'s schooling at Rebecca School and they intended to seek reimbursement.  (Pls. 56.1 ¶ 22; Ex. A at 3; Ex. D at 1–2.)

On July 27, 2009, the Parents visited the second placement with a privately retained behavioral consultant, Dr. Carole Fiorile.  (Pls. 56.1 ¶ 21; SRO Decision 2; Tr. 516:5–20, 553:11–21.)  On July 29, 2009, the Parents wrote to the DOE rejecting the second placement because (1) the "staffing ratio was insufficient for F.F.'s needs," (2) it "could not guarantee the availability of full-time support from an Orientation and Mobility Paraprofessional, as indicated

in F.F.'s IEP," (3) it "did not offer sufficient parent training," (4) it "did not offer sufficient occupational therapy ('OT') services and facilities, and might not be able to fulfill F.F.'s OT mandates until four months into the school year," and (5) "F.F. would be confined to a small trailer, without access to the school's related service therapy rooms, due to an emergency elevator breakdown." (Pls. 56.1 ¶ 22; *see also* SRO Decision 3; Ex. C at 1–2.) The letter also informed DOE of the intention to keep F.F. at the Rebecca School and that the Parents would be seeking reimbursement from the DOE. (Pls. 56.1 ¶ 22; SRO Decision 3; Ex. C. at 2.)

### f. The Rebecca School

F.F. was enrolled in the Rebecca School in April 2009 and began the 2009–2010 school year on July 6, 2009. (SRO Decision 2; Ex. M; Ex. N; Ex. O; *see also* Pls. 56.1 ¶ 31.) F.F. was enrolled in a class that had a student-to-teacher ratio of 8:1:6 — meaning eight students, one teacher, and six teacher assistants — in December, and a ratio of 8:1:3 in May 2010, and he received one-on-one paraprofessional services. (SRO Decision 2–3; *see also* Pls. 56.1 ¶¶ 31, 34; Tr. 311:21–22, 316:14–15, 319:23–320:6, 378:12–25, 397:6–22, 400:22–401:19, 414:14–415:10; Ex. H at 1, 3–4; Ex. I at 1, 3–7.) F.F. also had OT, PT and speech and language therapy, all in a one-on-one setting, three times each week for 30 minutes each session, and music therapy in a one-on-one setting once each week for 30 minutes each session. (SRO Decision 2–3; *see also* Pls. 56.1 ¶¶ 31, 34; Tr. 311:21–22, 316:14–15, 319:23–320:6, 378:12–25, 397:6–22, 400:22–401:19, 414:14–415:10; Ex. H at 1, 3–4; Ex. I at 1, 3–7.)

### g. Due Process Complaint

On June 23, 2010, the Parents filed a due process complaint alleging that DOE failed to provide an appropriate IEP and placement and requesting an impartial hearing and reimbursement for tuition and costs for F.F.'s fees at Rebecca School. (Pls. 56.1 ¶ 43; Def. ¶ 40;

Ex. A.)  The Parents alleged that the CSE was improperly composed because there was no

regular education teacher, additional parent member, social worker or individual qualified to

interpret the results of F.F.'s evaluations.  (Ex. A at 2–3; *see also* SRO Decision 3.)  The

complaint also asserted that F.F.'s reading, writing and math skills were not properly assessed.

(Ex. A. at 2–3; *see also* SRO Decision 3.)  The Parents also alleged that the levels of

performance in the IEP were insufficient, the annual goals and short-term goals in the IEP were

inadequate, there was no adaptive technology or adaptive chair, the one-to-one adult support was

vague, there was no individualized parent counseling and training, there was no BIP based upon

a FBA, and the IEP failed to identify a school placement.  (Ex. A at 2–3; SRO Decision 3.)  The

complaint further alleged that when the Parents were given placements for F.F., the placements

were insufficient.  (Ex. at 2–3; SRO Decision 3.)  The Parents sought reimbursement for the

Rebecca School tuition, private OT, PT, speech-language therapy and music therapy, and for

transportation services.  (Ex. A at 4; SRO Decision 3.)

### h.  Due Process Hearing and IHO Determination

A hearing before the IHO was held over eight non-consecutive days from December 7,

2010 to August 2, 2011.[5]  (Pls. 56.1 ¶ 44; Def. 56.1 ¶ 41; SRO Decision 4.)  Polina Telerman,

unit coordinator at the second placement, (Tr. 21:17–201:21), and Fochetta, DOE school

psychologist, (Tr. 205:10–273:13), testified on behalf of DOE.  Tina McCourt, program director

at the Rebecca School, (Tr. 279:6–363:3), Natalia Kimmelan, speech language pathologist at the

Rebecca School, (Tr. 369:23–401:25), Toni Sheridan, occupational therapist at the Rebecca

School, (Tr. 402:13–437:25), Robertson, F.F.'s special education teacher at the Rebecca School

---

[5]  The dates were December 7, 2010, February 7, 2011, February 8, 2011, March 25, 2011, April 14, 2011, June 9, 2011, July 19, 2011, and August 2, 2011.  (IHO Findings of Fact and Decision (2d Corrected) at 3.)

(Tr. 443:13–503:10), E.F., (Tr. 503:14–534:25), and Fiorile, (Tr. 539:12–580:12), testified on behalf of Plaintiffs.

The IHO issued an initial decision on September 22, 2011.  (Pls. 56.1 ¶ 45; Def. 56.1 ¶ 41; SRO Decision 4.)  This decision was corrected twice and the final version was published on October 13, 2011.  (Def. 56.1 ¶ 41; SRO Decision 4.)  The IHO found that DOE failed to provide a FAPE for the 2009–2010 school year and that the Parents should be reimbursed for tuition at the Rebecca School for the 2009–2010 school year in an amount not to exceed $84,900.  (Pls. 56.1 ¶ 45; Def. 56.1 ¶ 41.)  As part of the findings of fact, the IHO first summarized the testimony of the various witnesses at the hearings.  (IHO Findings of Fact and Decision (2d Corrected) 3–13.)  The IHO then found that:

> [T]he IEP developed for [F.F.] for the 2009-10 school year was not reasonably calculated to enable [F.F.] to make measurable gains. . . . the placement recommended by DOE is insufficient to meet [F.F.'s] physical needs and sensory issues. . . . DOE did not make a valid placement offer and did not take all appropriate steps to offer a suitable placement.

(IHO Findings of Fact and Decision (2d Corrected) 13.)  The IHO found the academic program at the Rebecca School "demonstrates consistent progress" and, therefore, it was "reasonably calculated to provide a meaningful and appropriate academic, social and emotional benefit."  (*Id.*)  The IHO also found that "[t]he evidence conclusively establishes that the [Parents] cooperated fully with the DOE," and, therefore, "the equities support the [Parents'] claim" and reimbursement was warranted.  (*Id.* at 14.)

### i.  Appeal to the SRO

DOE appealed the IHO's decision to the SRO on October 27, 2011.  (Def. 56.1 ¶ 43; Pls. 56.1 ¶ 46.)  DOE argued that the IEP was reasonably calculated to provide F.F. a FAPE and if F.F. had enrolled in one of the DOE's placements, the IEP would have been implemented.  (SRO

10

Decision 4.)  DOE asserted that the Rebecca School "was an inappropriate placement for the

student for the 2009–2010 school year because it did not offer the student a 1:1 paraprofessional

and the levels of related services provided by the Rebecca School were lower than those

recommended in [F.F.'s] June 2009 IEP requiring [the Parents] to have to supplement [F.F.'s]

program with outside services."  (SRO Decision 4.)  DOE also argued that the IHO's finding was

"unsupported by citation to the hearing record."  (SRO Decision 4.)  The Parents countered that

the IHO correctly determined that DOE failed to provide a FAPE, Rebecca School was an

appropriate placement and equitable considerations supported reimbursement.  (SRO

Decision 4.)

### j.    The SRO Decision

The SRO considered each of the claims raised by Plaintiffs that were alleged in the due

process complaint.  By decision dated January 13, 2012, the SRO, after a review of the record,

reversed the IHO and determined that the DOE had offered F.F. a FAPE for the 2009–2010

school year.  (Def. 56.1 ¶ 44; Pls. 56.1 ¶ 47.)  The SRO determined that the IHO had acted

improperly by granting an excessive number of extensions of the proceedings in violation of the

applicable rules and regulations.  (SRO Decision 7–9.)  The SRO also found that the IHO "failed

to cite applicable legal standards in rendering her determinations and cited only minimally to the

hearing record, which violates State regulation."  (*Id.*)  The SRO noted that the IHO "failed to

substantiate her findings by citing to specific portions of the hearing record that supported her

determinations, and delivered her findings in four conclusory paragraphs devoid of any

meaningful analysis."  (*Id.* at 10.)  The SRO then considered the merits of the appeal, despite

having found that the IHO did not properly lay out the reasons for her determination, and considered each of the following claims raised by Plaintiffs in their due process complaint.[6]  (*Id.*)

### i.   Composition of CSE

The Parents asserted that "the June 2009 CSE lacked a regular education teacher, an additional parent member, and an individual to interpret the instructional implications of [F.F.'s] evaluations."  (*Id.* at 11.)  DOE argued that CSE did not need a regular education teacher because F.F. "was not being considered for a general education placement" and since it was an annual review and not an initial placement, the lack of an additional parent member did not impede the Parents' ability to participate in the meeting.  (*Id.*)  The SRO found that "a regular education teacher of the student was not required at the June 2009 CSE meeting because the evidence does not support the conclusion that there was a reasonable likelihood that the student would have been assigned to such a teacher."[7]  (*Id.* at 12.)  As for the additional parent member, the SRO noted that an additional parent member is not required by the IDEA but is required under some instances by New York law, but this requirement can be waived by parents.  (*Id.*)  The SRO found that since the meeting was not an initial meeting of the CSE, meaning the first CSE to be

---

[6]  The SRO found that Plaintiffs had asserted several new claims on appeal — including claims that the "IEP was deficient because it failed to indicate whether the student's related services would be delivered on a push-in pull-out basis, that the assigned school was inappropriate for the student because it did not offer transition support services, and that the parents and Rebecca School teacher were denied meaningful participation at the CSE meeting." (SRO Decision 10–11.)  The SRO declined to consider these claims because they were not asserted in the due process complaint.  (*Id.*)

[7]  Plaintiffs have not pursued this argument in the proceedings before this Court.

convened for F.F., under New York law, it could have proceeded as a CSE subcommittee, and

subcommittees do not require additional parent members.[8]  (*Id.* at 13.)  The SRO found that:

> [E]ven if an additional parent member had been a required
> participant at the CSE meeting, the hearing record demonstrates
> that the absence of an additional parent member did not (a) impede
> [F.F.'s] right to a FAPE, (b) significantly impede [the Parents']
> opportunity to participate in the decision-making process regarding
> the provision of a FAPE to the student, or (c) cause a deprivation
> of educational benefits.

(*Id.*)  The SRO found that the Parents had full participation and a FAPE was not denied.  (*Id.*)

The SRO based her finding on the testimony of Fochetta, Robertson and E.F. and the CSE

meeting minutes.  (*Id.*)  The SRO also noted that the Parents "were familiar with the CSE

process" because they had participated in the CSE meeting for F.F.'s 2008–2009 IEP the prior

year.  (*Id.*)

### ii.  Assessment of F.F.'s Abilities

The Parents argued that the CSE "improperly relied on 'teacher observation' to report

[F.F.'s] skills in reading, writing, and math, without assessing [F.F.]."  (*Id.*)  DOE responded that

the CSE "considered appropriate and current evaluative data, including input from [the Parents]

and [Robertson]."  (*Id.*)  The SRO found that the CSE considered numerous documents,

including F.F.'s July 28, 2009 "pyschoeducational evaluation," F.F.'s September 2008 IEP,

F.F.'s April 2009 Rebecca School multidisciplinary progress report and F.F.'s June 2, 2009

classroom observation report, which had all been generated within a year of the meeting.  (*Id.* at

14.)  The SRO found "that the evaluation reports, together with input from [the Parents] and

from [Robertson], provided the June 2009 CSE with sufficient functional, developmental, and

---

[8]  However, as noted by Plaintiffs, none of the DOE's documents indicate that the DOE
or the participants considered the meeting to be a subcommittee meeting.  (Pls. Mem. 8.)

academic information about [F.F.] and his individual needs in order to develop an appropriate IEP." (*Id.*)

The SRO then analyzed what the IEP provided.  The SRO noted that given the various inputs, that "emphasis was placed on developing [F.F.'s] ability to maintain a regulated state, whereby he would remain 'focused, calm, and available for interaction and engagement.'" (*Id.* at 16 (citations omitted).)  The SRO noted that the IEP reflected F.F.'s diagnosis of multiple disabilities and his academic abilities and needs.  (*Id.*)  The SRO found that the IEP was an adequate reflection of F.F.'s social/emotional needs and noted that the IEP reflected F.F.'s "inquisitive demeanor," "anxiety," "growth in his ability to attend to peers in his environment," "increased intentionality [in] communications," "ability to two-way problem solve," "sense of humor" and "mischievousness."  (*Id.*)  The SRO also found that the IEP "noted that the focus and attention required for [F.F.] to engage in activities such as sitting in a chair or moving his body to attain a desired object sometimes led to dysregulation."  (*Id.*)  The IEP also indicated that F.F. "responded to peer initiated interactions and showed preferences for certain peers in the classroom" and that F.F. "showed a larger range of emotion and degrees or variations in happy and sad feelings."  (*Id.*)

The SRO also found the IEP to be an adequate reflection of F.F.'s "health and physical development."  (*Id.*)  The SRO noted that in addition to F.F.'s "diagnoses and ambulation and mobility challenges, the June 2009 IEP described [F.F.] as 'hypo-responsive' to physical sensations, having blind spots in his vision; demonstrating 'irregular' auditory processing skills and EEG readings, and indicated that he was suspected of having 'absent seizures.'" (*Id.* at 16–17.)  "The June 2009 IEP also reflected [F.F.'s] gluten-free diet and indicated that he was not independent in his activities of daily living (ADL) skills, was not toilet trained, and was not

14

verbal, and that although [F.F.] had no medical/health care needs during the school day, he did

have mobility limitations consistent with [cerebral palsy]."  (*Id.* at 17.)  The SRO noted that

according to Fochetta's testimony, there was no disagreement about the evaluation and

Robertson "expressly agreed with the present levels of performance as developed by the CSE."

(*Id.*)

### iii.  Goals and Objectives

The Parents argued that "the annual goals contained in the June 2009 IEP were deficient

because they were vague, insufficient, and did not identify methods of measurement of [F.F.'s]

progress, and were therefore inappropriate to address [F.F.'s] needs."  (*Id.*)  The SRO made

several findings with regard to the goals and objectives in the IEP.  First, she found that based on

Fochetta's testimony and other evidence in the record, the "pre-academic, PT, OT, and speech-

language annual goals and short-term objectives included in [F.F.'s] IEP were created based on

skills and needs identified in the April 2009 Rebecca School multidisciplinary progress report, in

conjunction with input from [the Parents] and [Robertson]."  (*Id.*)  She also found that the 12

annual goals "when considered by themselves, indicate[] they were vague and not measurable;

however, the 26 short-term objectives in the IEP were related to and served to clarify the annual

goals."  (*Id.* at 18.)  She further found that "[s]eventeen of the short-term objectives were

detailed and measurable and addressed [F.F.'s] areas of need specific to pre-academic skills" and

"nine short-term objectives addressed [F.F.'s] speech-language/communication abilities."  (*Id.*)

The SRO determined that "while [the] particular short-term objectives related to [F.F.'s] speech-

language/communication areas of need were not measurable, . . . that such a procedural error did

not impede [F.F.'s] right to a FAPE, significantly impede [the Parents'] opportunity to

participate in the decision-making process regarding the provision of a FAPE to [F.F.], or cause a

deprivation of educational benefits." (*Id.*) She noted that the goals and objectives had been taken from F.F.'s Rebecca School progress report. (*Id.*) F.F.'s speech-language pathologist from the Rebecca School testified that these were the areas F.F. worked on during the 2009–2010 school year at the Rebecca School. (*Id.*) The SRO found that these goals were consistent with the Rebecca School's multidisciplinary progress reports and did not deny F.F. a FAPE. (*Id.*) The SRO also noted that "although none of the annual goals in the June 2009 IEP relating to pre-academic skills, PT, and OT contained evaluative criteria or schedules, [the SRO found] that their related short-term objectives contained sufficiently detailed information regarding the condition under which each objective was to be performed and the frequency, duration, and percentage of accuracy required for measurement of progress and remedied any deficiencies in the annual goals." (*Id.* at 19 (internal quotation marks omitted) (quoting *Tarlowe v. N.Y.C. Bd. of Educ.*, No. 07-CV-7936, 2008 WL 2736027, at *9 (S.D.N.Y. July 3, 2008)).)

### iv. Program Recommendation

The Parents argued that the program outlined in the IEP was insufficient, including the fact that they thought "1:1 adult support listed in the June 2009 IEP as an academic management need was 'vague,'" the IEP "failed to specify any level of 1:1 instruction" and the 6:1:1 special class was insufficient to meet F.F.'s needs. (*Id.* at 20.) The SRO found that "the evidence contained in the hearing record establishes that the district's recommended educational program as embodied in the June 2009 IEP, was at the time of its development, reasonably calculated to enable [F.F.] to receive educational benefits," since it addressed his academic, health and physical needs. (*Id.* at 20–21.) The SRO also found that the provision of one-to-one adult support was not vague because it was clear that a paraprofessional would be used to help F.F. with his mobility issues. (*Id.*)

### v.  Assistive Technology

The Parents argued there was no assistive technology in the IEP, making it inappropriate. (*Id.* at 21.)  The SRO found that a FAPE was not denied because there was no reference to the use of assistive technology since the Parents stated that they were still evaluating F.F. for assistive technology at the time of the CSE meeting and the Rebecca School progress reports made no mention of the use of assistive technology.  (*Id.*)

### vi.  Parent Counseling and Training

The Parents asserted that there was no parent counseling and training in the IEP rendering it deficient.  (*Id.*)  The SRO found that while parent counseling and training had not been specifically outlined in the IEP, (a) New York law requires that parent counseling and training be provided, and, thus its omission from the IEP is not normally a denial of a FAPE and, (b) the second placement school offered parent workshops and daily communication between parents and teachers which were similar to the parent counseling and training provided at the Rebecca School.  (*Id.* at 22.)

### vii.  Provisions for Interfering Behavior

The Parents also objected to the fact that the IEP did not contain any provisions for special factors and interfering behavior, specifically that "it lacked a BIP based upon an FBA for" F.F.  (*Id.*)  The SRO found that "the hearing record lacks sufficient evidence to establish that [F.F.] required a BIP in order to obtain educational benefits" since F.F.'s behavior "did not seriously interfere with instruction and could be addressed by the special education teacher through support provided by [F.F.'s] OT, PT, and speech-language services providers."  (*Id.* at 25.)

17

### viii.   Assigned School

The Parents argued that the assigned school would not be able to implement the IEP and was therefore not an appropriate placement for F.F. because the class ratio of teachers to students was inadequate, F.F. would not have a personal paraprofessional, the OT facilities were insufficient, and the staff did not know American Sign Language. (*Id.* at 25–29.) The SRO found that since the Parents never enrolled F.F. in any of the placement schools, the placement schools could not be a basis for finding a denial of a FAPE. (*Id.* at 25.) Rather, "[t]he sufficiency of the district's offered program is to be determined on the basis of the IEP itself."[9] (*Id.* at 26.) The SRO also found no support for the contention that a one-on-one paraprofessional could not have been provided to F.F. other than the testimony of E.F., and all other evidence in the record contradicted this assertion. (*Id.*) With regard to the OT services, the SRO found that while the Parents may have preferred the sensory equipment at the Rebecca School, DOE was under no obligation to provide "every special service necessary to maximize each handicapped child's potential" and the placement school was under no obligation to provide the same equipment as the Rebecca School. (*Id.*) The SRO did not "find support in the hearing record for [the Parents'] contention that the student-to-teacher ratio of the assigned 6:1+1 special class [at the second placement] was inadequate to enable the student to receive educational benefits." (*Id.* at 27.) The SRO found no evidence that the placement school would be unable to provide the OT services as indicated in the IEP. (*Id.* at 29.) The SRO also found the argument that the placement was inappropriate because the school did not use sign language "unpersuasive"

---

[9]   The SRO did note that Plaintiffs could have had a claim if they had enrolled F.F. in a school that actually failed to implement the IEP, rather than just conjecture that the school would have been unable to implement F.F.'s IEP. (SRO Decision 26.)

because there was testimony that at least some sign language was used at the second placement. (*Id.*)

### ix.   SRO Conclusion

Consequently, the SRO found that the IEP provided a FAPE to F.F.   (*Id.* at 30.)   The SRO therefore did not determine whether the Rebecca School placement was appropriate or whether equitable considerations supported the Parents' request for reimbursement.   (*Id.*)

## II.   Discussion

### a.   Standard of Review

Summary judgment in this context is effectively an appeal of the State's decision.   *R.E.*, 694 F.3d at 184 ("Summary judgment in this context involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions." (internal quotation marks omitted) (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009))); *M.H.*, 685 F.3d at 226 ("Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]." (citations omitted)).   "A reviewing court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence."   *M.H.*, 685 F.3d at 240 (citations and internal quotation marks omitted); *see also R.E.*, 694 F.3d at 184 ("A federal court reviewing a dispute over an IEP must base its decision on the preponderance of the evidence." (citations omitted)).   However, a federal court reviewing the administrative decision "must defer to the administrative decision because 'the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"   *R.E.*, 694 F.3d at 184 (citations omitted); *M.W. ex rel. S.W.*, --- F.3d at ---, 2013 WL

3868594, at *4 ("In undertaking this independent review, we are further restrained by our lack of specialized knowledge and educational expertise; we must defer to the administrative decision [particularly where] the state officer's review has been thorough and careful." (alterations in original) (internal quotation marks and citations omitted)).  "District courts are not to make 'subjective credibility assessment[s],' and cannot 'ch[oose] between the views of conflicting experts on . . . controversial issue[s] of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence.'"[10]  *M.H.*, 685 F.3d at 240 (alteration in original) (citation omitted).

The Second Circuit has held that deference "is particularly appropriate" where the state administrative review "has been thorough and careful."  *R.E.*, 694 F.3d at 184 (citing *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998); *M.H.*, 685 F.3d at 241 (same). Deference does not mean that the federal court "simply rubber stamp administrative decisions." *R.E.*, 694 F.3d at 184 (citations omitted).  "The SRO's or IHO's factual findings must be 'reasoned and supported by the record' to warrant deference."  *M.H.*, 685 F.3d at 241 (citations

---

[10]  The Second Circuit has given examples of when an opinion of the SRO should be given more or less deference:

> By way of illustration, determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures.  Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress.  Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not.  And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

*M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) (citations omitted); *see also B.R. ex rel. K.O.*, 2012 WL 6691046, at *4.

omitted).  The Supreme Court and the Second Circuit have noted that a federal court's

independent review is something between *de novo* review and "limited . . . review for state

compliance with the Act's procedural requirements [with] no power to review the substance of

the state program."  *M.H.*, 685 F.3d at 241–42 (quoting *Rowley*, 458 U.S. at 205).

     "If the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision

may be afforded diminished weight."  *M.H.*, 685 F.3d at 241 (citations omitted).  "Where the

IHO and SRO disagree, reviewing courts are not entitled to adopt the conclusions of either state

reviewer according to their own policy preferences or views of the evidence; courts must defer to

the reasoned conclusions of the SRO as the final state administrative determination."  *M.H.*, 685

F.3d at 246 (citations omitted); *see also M.W. ex rel. S.W.*, --- F.3d at ---, 2013 WL 3868594, at

*4 ("Where an SRO has clearly demonstrated a better command of the record and supported her

conclusions through better legal and factual analysis than an IHO, we will have little difficulty

deferring to the SRO's opinion."); *T.L. v. N.Y.C. Dep't of Educ.*, No. 12-CV-4483, 2013 WL

1497306, at *10 (E.D.N.Y. Apr. 12, 2013) ("When, as in the present case, the IHO and SRO

disagree, the general rule is that courts must defer to the reasoned conclusions of the SRO as the

final state administrative determination." (internal quotation marks omitted) (quoting *R.E.*, 694

F.3d at 189)).

### b.  Procedural Deficiencies

     "The initial procedural inquiry in an IDEA case 'is no mere formality,' as 'adequate

compliance with the procedures prescribed would in most cases assure much if not all of what

Congress wished in the way of substantive content in an IEP.'"  *Davis v. Wappingers Cent. Sch.

Dist.*, 431 F. App'x 12, 14 (2d Cir. 2011) (alteration omitted) (citing *A.C. ex rel. M.C.*, 553 F.3d

at 172).  Not "every procedural error in the development of an IEP renders that IEP legally

inadequate under the IDEA." *Davis*, 431 F. App'x at 14–15 (quoting *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003)); *see also A.C. ex rel. M.C.*, 553 F.3d at 172 (quoting *Grim* for the same proposition).  For procedures to be sufficient, they must provide "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child."  20 U.S.C. § 1415; *see also see also F.L. ex rel. F.L. v. N.Y.C. Dep't of Educ.*, No. 11-CV-5131, 2012 WL 4891748, at *6 (S.D.N.Y. Oct. 16, 2012) (quoting 20 U.S.C. § 1415).  Procedural deficiencies only require reimbursement when "they 'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'"  *R.E.*, 694 F.3d at 190 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)); *see also Davis*, 431 F. App'x at 15 (outlining the factors that make procedural factors sufficient for reimbursement).  "Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not."  *R.E.*, 694 F.3d at 190.

Plaintiffs argue that there were six procedural errors in the development of F.F.'s IEP plan rendering it defective:  (1) the CSE was improperly convened; (2) the CSE failed to consider the continuum of programming for F.F. and to consider his individual needs; (3) the goals and objectives were not appropriate; (4) DOE failed to consider assistive technology; (5) there was no parent counseling and training provided for in the IEP; and (6) the IEP failed to address F.F.'s behavioral needs.  (*See generally* Pls. Mem. 6–16.)  The SRO found that none of the alleged procedural deficiencies resulted in a denial of a FAPE.  (SRO Decision 11–25.)  As

set forth below, the SRO's opinion is supported by a preponderance of the evidence in the

record, and the Court affirms the SRO's determination.

### i.  Committee on Special Education

Plaintiffs argue that the CSE was improperly convened because there was no "individual

to interpret the instructional implications of F.F.'s evaluation results" and there was no parent

member.  (Pls. Mem. 7–8.)  The SRO found that Plaintiffs' argument that there was no one on

the CSE to interpret the instructional implications of F.F.'s evaluation results was without merit

and not supported by the record.  (*See* SRO Decision 11 n.6.)  The SRO noted that both Fochetta,

who is a school psychologist, and Ye, who is a special education teacher, could have performed

this function.  (*Id.*)

New York State law requires that the CSE include:

> [A]n individual who can interpret the instructional implications of
> evaluation results.  Such individual may also be the individual
> appointed as the regular education teacher, the special education
> teacher or special education provider, the school psychologist, the
> representative of the school district or a person having knowledge
> or special expertise regarding the student when such member is
> determined by the school district to have the knowledge and
> expertise to fulfill this role on the committee . . . .

N.Y. Comp. Codes R & Regs. tit. 8 (hereinafter referred to as "8 N.Y.C.R.R.") §  200.3(a)(1)(vi).

Given that two members of the CSE could have functionally performed this role, the SRO's

determination is supported by preponderance of the evidence and F.F. was not denied a FAPE.

*See, e.g.*, *C.T. v. Croton-Harmon Union Free Sch. Dist.*, 812 F. Supp. 2d 420, 430–31 (S.D.N.Y.

2011) ("Courts in this Circuit have upheld the validity of an IEP even where a special education

teacher is absent from the CSE meeting.  Courts finding that such an error did not deny a student

a FAPE considered whether the participants in the meeting had the requisite expertise to ensure

that a student's special education options were properly considered." (citations omitted)); *see*

*also A.D. v. N.Y.C. Dep't of Educ.*, No. 12-CV-2673, 2013 WL 1155570, at *7 (S.D.N.Y. Mar. 19, 2013) (declining to find a FAPE denied where the member was qualified and the parents had provided no evidence that the member was not qualified to fulfill the position); *R.C. ex rel. M.C. v. Byram Hills Sch. Dist.*, 906 F. Supp. 2d 256, 271 (S.D.N.Y. 2012) (the CSE need only have a member who can perform the function as outlined by the regulation); *J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F. Supp. 2d 606, 646–47 (S.D.N.Y. 2011) (finding that a FAPE was not denied despite the fact that a "specially designated special education instructor" was not present at the meeting as "the parents have not [provided evidence] that this shortcoming on the part of [defendant] obstructed [the student's] right to a free appropriate public education, limited their opportunity to participate in the decision making process, or deprived [the student] of any educational benefit"). Plaintiffs' counsel at oral argument stated that there "may" have been a problem with Fochetta and Ye performing the function, since according to counsel, Fochetta was not familiar with the 6:1:1 program and Ye had not taught students with F.F.'s particular disabilities.[11] (Oral Arg. Tr.[12] 12:1213:19.) However, counsel conceded that according to the law, both Fochetta and Ye could have performed the function. (*Id.*) This claim is without merit.

Plaintiffs' second argument, that the absence of another parent member rendered the CSE and therefore the IEP defective, is also without merit. (Pls. Mem. 7–8.) The SRO found that since the CSE was not considering an initial placement of F.F.,[13] the CSE could have proceeded

---

[11]  Accepting counsel's statements that Fochetta was not familiar with the 6:1:1 program and Ye had never taught students with F.F.'s particular disabilities as accurate, counsel did not identify any evidence in the record to support her claim that Fochetta and Ye were not qualified to perform this function.

[12]  "Oral Arg. Tr." refers to the transcript from the oral argument before the Court.

[13]  Both parties agree that a prior IEP was prepared for F.F. for the 2008–2009 school year. (*See* Pls. 56.1 ¶¶ 9, 11; Def. 56.1 ¶¶ 6, 26.)

as a CSE subcommittee.  (SRO Decision 12–13.)  The SRO also found that even assuming an

additional parent participant had been required "the hearing record demonstrates that the absence

of an additional parent member did not (a) impede [F.F.'s] right to a FAPE, (b) significantly

impede the [Parents'] opportunity to participate in the decision-making process regarding the

provision of a FAPE to [F.F.], or (c) cause a deprivation of educational benefits."  (*Id.* at 13.)

While the presence of a parent member is required by New York law under certain

circumstances, it is not required by the IDEA and is therefore not a procedural error under the

IDEA.  *Cf. J.G. ex rel. N.G.*, 777 F. Supp. 2d at 647 ("The IDEA does not require the presence of

a parent member and the parent member's absence cannot, therefore, be considered a procedural

defect under the federal statute."  (quoting *Bd. of Educ. v. Mills*, No. 03-CV-0050, 2005 WL

1618765, at *5 (S.D.N.Y. Jul. 11, 2005))).  At the time the CSE for F.F. was convened, New

York state regulations required that a CSE include "an additional parent member of a student

with a disability residing in the school district or a neighboring school district, provided such

parent is not a required member if the parents of the student request that the additional parent

member not participate in the meeting . . . ."[14]  *W.S. v. Nyack Union Free Sch. Dist.*, No. 09-CV-

10139, 2011 WL 1332188, at *1 (S.D.N.Y. Mar. 30, 2011) (alteration in original) (quoting 8

N.Y.C.R.R. § 200.3(a)(1) (viii)); *see also K.S. v. N.Y.C. Dep't of Educ.*, No. 11-CV-7443, 2012

WL 4017795, at *1 (S.D.N.Y. Aug. 8, 2012) (quoting 8 N.Y.C.R.R. § 200.3(a)(1)(viii) pre-

amendment); *J.A. v. N.Y.C. Dep't of Educ.*, No. 10-CV-9056, 2012 WL 1075843, at *1

(S.D.N.Y. Mar. 28, 2012) (same); *N.Y.C. Dep't of Educ. v. V.S.*, No. 10-CV-05120, 2011 WL

3273922, at *3 n.2 (E.D.N.Y. July 29, 2011) (same).

---

[14]  This provision was amended as of January 2, 2013, to require an additional parent
member only if requested in writing by the parent, student or member of the committee.  34 N.Y.
Reg. 14 (Sept. 26, 2012).

As the SRO found, since it was not an initial placement, the CSE could have been held as a subcommittee.  N.Y. Educ. Law § 4402(1)(b)(1)(d); 8 N.Y.C.R.R. § 200.3(c)(2)–(5). However, Plaintiffs are correct that the meeting technically proceeded as a CSE rather than a CSE subcommittee, and therefore, technically required an additional parent member. Nevertheless, the absence of an additional parent member requires reimbursement of a parent's unilateral placement in a private school only if it "'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'"  *R.E.*, 694 F.3d at 190 (citations omitted); *see also W.S.*, 2011 WL 1332188, at *9 (finding no denial of a FAPE where "[t]here is no evidence in the record to support [the plaintiff's] contention that the absence of an additional parent member 'result[ed] in insufficient information being available to the CSE team and [ ] a faulty IEP'" (citations omitted)); *Mills*, 2005 WL 1618765, at *5 (finding that a FAPE was not denied where "there [was] no indication that the parent member's absence resulted in a loss of educational opportunity").

As the comments to the amended rule make clear, the purpose in having an additional parent member on the CSE is to "help parents understand and participate in the meeting by explaining the procedures, asking questions and clarifying information."  2012 NY REG TEXT 305185 (NS).  Furthermore, as the New York State Assembly Memorandum in Support of the amended rule makes clear, New York State is the only state that requires an additional parent member to the CSE and "[a]lthough a parent member may provide insight into the IEP process, no part of the IEP development is dependent on the additional parent member's expertise." A7216-A, 2011–2012 Reg. Sess., 2012 c.276.  Having been through the IEP process the prior year, the Parents were familiar with the CSE meeting.  Also, E.F. testified that she fully

26

participated in the meeting and made suggestions about many items of interest, including F.F.'s love of music, that eventually made it into the IEP.  (*See* Tr. 510:13–23, 511:10–21, 531:23–532:7; Ex. B at 3.)  In addition, the goal related to having F.F. ambulate was included in the IEP at the Parents' request.  (Tr. 225:17–23.)  Robertson, F.F.'s then special education teacher at the Rebecca School, testified that she fully participated and tried to help the Parents throughout the CSE meeting.  (Tr. 456:15–23.)  While Robertson ultimately disagreed with the placement of F.F. in a 6:1:1 class in a special school, the evidence demonstrates that there was full participation by the Parents and Robertson.  Thus, although the absence of another parent member of the CSE was a procedural error, Plaintiffs cannot maintain that it led to the denial of a FAPE.  *See McCallion v. Mamaroneck Union Free Sch. Dist.*, No. 10-CV-6207, 2013 WL 237846, at *10 (S.D.N.Y. Jan. 22, 2013) ("Notably, Parent actively participated in the development of the October 2008 IEP, both by attending the CSE meeting and by exchanging several follow-up emails with District personnel.  Therefore, any procedural defect with respect to the composition of the CSE 'was not alone sufficient to result in the loss of educational opportunity.'" (citations omitted)); *see also W.S.*, 2011 WL 1332188, at *9 ("There is no evidence in the record to support Plaintiff's contention that the absence of an additional parent member 'result[ed] in insufficient information being available to the CSE team and [ ] a faulty IEP.'" (citations omitted)); *Mills*, 2005 WL 1618765, at *5 ("[T]here is no indication that the parent member's absence resulted in a loss of educational opportunity for M.S. or infringed on W.S.'s ability to participate in the CSE.").

### ii.  F.F.'s Continuum of Programming and Treatment of Parents

Plaintiffs state that the continuum of programing in F.F.'s IEP denied F.F. a FAPE for two reasons:  (1) the IEP's provision of a 6:1:1 special class in a special school placement was

inadequate for F.F., and (2) the CSE failed to treat the Parents and Robertson as full members of the CSE by failing to consider their requests for more one-on-one instruction.  (Pls. Mem. 8–9.)  The SRO found the first contention to be without merit and the second to barred because the Parents failed to raise it in their due process complaint.  (SRO Decision 10–11, 20–21.)  As set forth below, Plaintiffs have failed to demonstrated that F.F. was denied a FAPE because of the continuum of programing in the IEP.  The Court finds that the SRO's decision is supported by a preponderance of the evidence in the record and affirms the placement decision.  In addition, the Court affirms the SRO's finding that the Parents did not raise the issue of being treated as full members of the CSE in their due process complaint.  Nevertheless, the Court reviews the merits of this claim and finds it to be without merit.

### 1.  Continuum of Programming

Plaintiffs assert that "the DOE failed to consider the full continuum of programing which may have been appropriate for F.F." because the IEP "offered F.F. a placement in a 6:1:1 special class in a specialized school" and "no one at the meeting explained how much 1:1 instruction would be available in the 6:1:1 special class."[15]  (Pls. Mem. 8.)  Plaintiffs argue that F.F. should have been considered for other alternatives.  (Pls. Mem. 8–9, Ex. A, Oral Arg. Tr. 17:16–18:11, 20:2–22:25.).  The SRO found that the IEP "was at the time of its development, reasonably calculated to enable [F.F.] to receive educational benefits in the [least restrictive environment] for the 2009–10 school year."  (SRO Decision 20–21.)  The SRO also found Plaintiffs' argument that it was unclear how much one-on-one instruction F.F. would receive was "unpersuasive" because the IEP provided for a one-on-one paraprofessional to help F.F. with his mobility issues

---

[15]  Plaintiffs challenge the class size as a procedural error.  However, in *R.E.* the Second Circuit examined class size as a substantive issue.  *See R.E.*, 694 F.3d at 192.  Regardless of whether this challenge to the IEP is considered a procedural or substantive challenge, the Court finds it to be without merit.

and the Parents stated at the meeting that they wanted several of his goals in his IEP to relate to F.F.'s ability to ambulate.  (*Id.*)

Plaintiffs rely on 34 C.F.R. § 300.115 and 8 N.Y.C.R.R. § 206 to support their argument that the DOE failed to provide F.F. the full continuum of programming for his individual needs. (Pls. Mem.8–9.)  C.F.R. § 300.115 states that "[e]ach public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services" and that providing a continuum of alternative placements includes "the alternative placements listed in the definition of special education under § 300.38 (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions)" and "supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement."  34 C.F.R. § 300.115.  Under 8 N.Y.C.R.R. § 200.6, "[a] student with a disability shall be provided the special education specified on the student's IEP to be necessary to meet the student's unique needs."  8 N.Y.C.R.R. § 200.6.  Among the many provisions of § 200.6, there is a "cap class size at six for students with 'highly intensive' needs 'requiring a high degree of individualized attention and intervention,' and at eight for students with 'intensive' needs."  *E.H. v. Bd. of Educ. of Shenendehowa Cent. Sch. Dist.*, 361 F. App'x 156, 159 (2d Cir. 2009) (quoting 8 N.Y.C.R.R. § 200.6(h)(4)(ii)(a)–(b)).  "Children whose disabilities do present particular management concerns are grouped in smaller-than-average size classes of six, eight, or twelve students, depending on the degree of intervention required."  *Walczak*, 142 F.3d at 123 (citing 8 N.Y.C.R.R. § 200.6(g)(4)).

"The IDEA 'expresses a strong preference' for educating disabled students alongside their non-disabled peers; that is, in their least restrictive environment.'"  *M.W. ex rel. S.W.*, ---

F.3d at ---, 2013 WL 3868594, at *9 (citations omitted); *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 487 F. App'x 619, 621 (2d Cir. 2012) ("The 'special education and related services must be provided in the least restrictive setting consistent with a child's needs.'" (quoting *Walczak*, 142 F.3d at 122)).  Under the law, once the DOE determined that 6:1:1 was the least restrictive environment in which F.F. could be educated, it was not obligated to consider a more restrictive environment, such as the Rebecca School.  *A.D.*, 2013 WL 1155570, at *8 ("[O]nce the CSE determined that a 6:1:1 classroom would be appropriate for the Student, it had identified the least restrictive environment that could meet the Student's needs and did not need to inquire into more restrictive options such as nonpublic programs."); *R.C. ex rel. M.C.*, 906 F. Supp. 2d at 273 ("While it is natural to assume that a student would benefit from being in a smaller classroom environment with more support, the IDEA does not require that the District provide an ideal learning environment, but instead only one where the student can progress.  Additionally, the SRO's determination is consistent with the IDEA's strong preference for 'mainstreaming or educating children with disabilities to the maximum extent appropriate alongside their non-disabled peers.'  Thus Plaintiffs have not demonstrated that the IEP's recommendations would deny M.C. a FAPE." (quoting *M.H.*, 685 F.3d at 244)); *cf. E.H.*, 361 F. App'x at 159 (finding the class size for students with "highly intensive needs" is capped at six).

The SRO found the program in the IEP for a 6:1:1 in a special class in a special school to be the least restrictive environment that could meet F.F.'s needs.  (SRO Decision 21.)  The SRO determined that the IEP addressed F.F.'s "academic needs as identified in the evaluative data available to the CSE" by recommending sensory tools, special seating, and one-to-one adult support.  (*Id.* at 20.)  The SRO also found that the program addressed F.F.'s "social/emotional management needs" by providing for "sensory material and adaptive seating," and addressed his

"health and physical needs through recommendations for an accessible program, adapted physical education with a 6:1+1 staffing ratio, continuation of OT and PT, and provision of an oral motor protocol prior to eating." (*Id.*)  The SRO further found that the Parents' assertion that the IEP "'failed to specific any level of 1:1 instruction' or support for" F.F. to be "unpersuasive" because Fochetta testified that F.F. would be provided a one-on-one paraprofessional to help him with mobility and that a few of the goals advocated by the Parents and Robertson were to help F.F. with ambulation. (*Id.* at 20–21.)  In making her determination, the SRO relied on the testimony of Fochetta at the hearing, the IEP and the CSE meeting minutes. (*Id.*)

The SRO's determination is supported by the record before the SRO, since Fochetta testified at length as to why she believed a 6:1:1 program in a special school would provide F.F. with the appropriate classroom setting, with the addition of a one-on-one paraprofessional and daily therapy sessions. (Tr. 234:6–235:10, 244:7–17, 245:15–20, 256:11–18.)  In addition, the IEP clearly provides for a one-on-one paraprofessional. (Ex. B at 2, 7, 9.)  In their due process complaint and their moving papers before the Court, Plaintiffs question whether F.F. would have been provided a one-on-one paraprofessional as required by the IEP. (Ex. A. at 4; Pls. Mem. 19.)  However, Plaintiffs had no reason to question whether the DOE would have provided F.F. with a paraprofessional as required by the IEP, since, according to the Rebecca School contract, a paraprofessional was not provided by the Rebecca School, (Ex. M; Tr. 256:3–257:7), and DOE was already providing a paraprofessional for F.F. at the Rebecca School, (Tr. 256:3–257:7). Moreover, Tellerman testified that in the class that would probably have been F.F.'s class, there were several personal paraprofessionals for students, and they could have provided F.F. with his own mobility paraprofessional. (Tr. 35:1–9, 40:8–16.)  She also testified that the paraprofessionals helped the teachers with instruction. (Tr. 95:6–16.)

Given that the SRO's determination is supported by a preponderance of the evidence in the record and her determination of appropriate school program is the type of educational policy determination to which the Court affords great deference to the SRO, the Court affirms the SRO's determination that the program in the IEP did provide the appropriate continuum of programming for F.F. and gave him a FAPE in the least restrictive environment as mandated by the IDEA.[16]  *See, e.g.*, *K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ.*, --- F. App'x ---, ---, 2013 WL 3814669, at *5 (2d Cir. July 24, 2013) ("The adequacy of 1:1 paraprofessional support as opposed to 1:1 teacher support is precisely the kind of educational policy judgment to which we owe the state deference if it is supported by sufficient evidence, as is the case here." (quoting *R.E.*, 694 F.3d at 192)); *T.B. v. Haverstraw-Stony Point Cent. Sch. Dist.*, No. 11-CV-5421, 2013 WL 1187479, at *20 (S.D.N.Y. Mar. 21, 2013) (finding that despite the parents desire for a more restrictive classroom setting, "there [wa]s insufficient evidence to overcome the SRO's" determination that the IEP provided for the least restrictive environment and "the [p]laintiff bears the burden of demonstrating that the SRO's determination is not supported by the preponderance of the evidence"); *A.D.*, 2013 WL 1155570, at *7–8 (agreeing with SRO "that the CSE's failure to consider non-public school placements was not a procedural violation"); *J.L. v. City Sch. Dist. of N.Y.C.*, No. 12-CV-1516, 2013 WL 625064, at *9 (S.D.N.Y. Feb. 20, 2013) ("[T]he SRO [found that the] intensive, specialized classroom instruction in a general school setting addressed C.L.'s academic and social needs in the least restrictive environment in which he could be

---

[16]  The Court notes that while there is other testimony in the record that 6:1:1 in a special school may not have been appropriate for F.F., it is not the Court's function to weigh the credibility of various witnesses at the administrative level, but rather, to determine whether there is a preponderance of the evidence in the record to support the SRO's determination.  *M.H.*, 685 F.3d at 240 (holding that it is the SRO's purview to "subjective credibility assessment[s]" and "ch[oose] between the views of conflicting experts on . . . controversial issue[s] of educational policy" (alteration in original) (citation omitted)).

expected to make progress. This is precisely the sort of expert assessment to which a reviewing court must give deference in the IDEA context."); *E.M. v. N.Y.C. Dep't of Educ.*, No. 09-CV-10623, 2011 WL 1044905, at *10 (S.D.N.Y. Mar. 14, 2011) (finding that "the SRO evaluated evidence from both sides and made assessments of credibility and appropriate educational policy [,and] [t]he Second Circuit is clear that in such circumstances, a district court may not second-guess the reasoned judgments of an SRO" and therefore upholding the SRO's finding that 6:1:1 class was appropriate (citations omitted)).

## 2. Participation of the Parents and Robertson in the CSE

Plaintiffs assert that "[t]he DOE also failed to consider the Parents' and Ms. Robertson's requests, and in so doing, failed to treat them as full and equal IEP Team members." (Pls. Mem. 8–9.) The SRO found that Plaintiffs' contention that they were not treated as full members was barred from review because it was not raised directly in the due process complaint. (SRO Decision 10–11.) Under case law in this Circuit, "[t]he scope of the inquiry of the IHO, and therefore the SRO and this Court, is limited to matters either raised in the [p]laintiffs' impartial hearing request or agreed to by Defendant."[17] *B.P. v. N.Y.C. Dep't of Educ.*, 841 F. Supp. 2d 605, 611 (E.D.N.Y. 2012) (citing 20 U.S.C. § 1415(f)(3)(B); 34 C.F.R. § 300.511(d); 8 N.Y.C.R.R. § 200.5(j)(1)(ii)); *see also R.E.*, 694 F.3d at 187–88 (the due process complaint "must list all of the alleged deficiencies in the IEP . . . parents are precluded in later proceedings from raising additional defects in the IEP that they should have raised from the outset"); *J.C.S. v.*

---

[17] The reason for this requirement is to give the school districts thirty days to remedy any issues raised in the due process complaint without any penalty and it is only after this period has lapsed that parents of a student can continue with the complaint. *R.E.*, 694 F.3d at 187–88 ("An important feature of the IDEA is that it contains a statutory 30–day resolution period once a 'due process complaint' is filed. That complaint must list all of the alleged deficiencies in the IEP. The Department then has thirty days to remedy these deficiencies without penalty. . . . The adequacy of the IEP will then be judged by its content at the close of the resolution period.").

*Blind Brook-Rye Union Free Sch. Dist.*, No. 12-CV-2896, 2013 WL 3975942, at *8 (S.D.N.Y. Aug. 5, 2013) ("'[T]he party requesting the hearing [must] lay out specifically in the [DPC] the issues that will be before the hearing officer,' and courts have authority to review only those issues." (citations omitted)); *Dirocco ex rel. M.D. v. Bd. of Educ. of Beacon City Sch. Dist.*, No. 11-CV-3897, 2013 WL 25959, at *23 (S.D.N.Y. Jan. 2, 2013) ("The IDEA and federal and state regulations require that the party requesting the impartial hearing lay out specifically in the due process complaint the issues that will be before the hearing officer.  The party who [requests] an impartial hearing is restricted to the issues raised in their due process complaint, unless the complaint is amended prior to the hearing or the other party consents." (internal quotation marks and citations omitted)).  The issue was not raised in the due process complaint, and, therefore, the SRO's decision that it was barred from review is supported by the record and case law. *J.C.S.*, 2013 WL 3975942, at *8–9 (S.D.N.Y. Aug. 5, 2013) (holding that the district court lacked subject matter jurisdiction to hear a claim not properly presented to the IHO and SRO); *Dirocco ex rel. M.D.*, 2013 WL 25959, at *23 ("'The party who [requests] an impartial hearing is restricted to the issues raised in their due process complaint, unless the complaint is amended prior to the hearing or the other party consents.'  Therefore, the [plaintiffs'] failure to raise the lack of spelling goals in their amended due process complaint 'foreclosed its proper consideration.'" (citations omitted)); *B.P.*, 841 F. Supp. 2d at 611 (holding that the plaintiffs "have waived the argument they and Ms. Goldfrank were denied meaningful participation in the development of the IEP" by not raising it the due process complaint).

Plaintiffs argue that the issue was vaguely referred to in the complaint and raised by the DOE in the hearing testimony and is therefore not barred from review by the Court.  (Pls. Mem. 8–9.)  Even assuming that the Court agreed with Plaintiffs that the issue was properly before the

34

IHO, the SRO and the Court, the claim lacks merit.  Under the law, "parents [must be given the] opportunity to meaningfully participate in the IEP development process."  *Dirocco ex rel. M.D.*, 2013 WL 25959, at *18.  However, as long as the parents are listened to, this burden is met even if the DOE ultimately decides not to follow the parents' suggestions.  *Dirocco ex rel. M.D.*, 2013 WL 25959, at *20 ("[T]he District considered their suggestions as they were explicitly discussed in the final IEP.  'The fact that the District staff ultimately disagreed with the opinions of plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity to participate in the development of the IEP[ ], or that the outcome[ ] of the CSE meeting[ ][was] 'pre-determined.'  A professional disagreement is not an IDEA violation.'" (quoting *P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist.*, 569 F. Supp. 2d 371, 383 (S.D.N.Y. 2008))).  "Parental participation requires an opportunity to examine records, participate in meetings, and to obtain an independent evaluation."  *Dzugas-Smith v. Southold Union Free Sch. Dist.*, No. 08-CV-1319, 2012 WL 1655540, at *27 (E.D.N.Y. May 9, 2012) (quoting *T.L. ex rel. B.L. v. Dep't of Educ. of N.Y.C.*, No. 10-CV-3125, 2012 WL 1107652, at * 14 (E.D.N.Y. Mar. 30, 2012))).

The three members of the CSE who testified before the IHO consistently said that everyone had input in the creation of the IEP and the entire content of the IEP was discussed at the meeting.  (*See* Tr. 219:20–220:3, 222:23–223:3, 224:21–23, 258:16–19; 483:22–484:1, 531:23–532:7.)  E.F. testified that she had input and she thought the CSE members were "nice." (Tr. 531:23–532:7.)  Robertson specifically testified that the IEP meeting "was a very long meeting."  (Tr. 456:15–23.)  Robertson agreed with the academic and social emotional performance segments of the IEP.  (Tr. 449:8–451:1, 452:13–454:5.)  The IEP included F.F.'s love of music because of a request from E.F.  (Ex. B; Tr. 508:24–509:4.)  All of the goals of the

IEP were determined with Robertson's input and based on reports from therapists at the Rebecca School and suggestions by the Parents, including adding ambulation as a goal at the Parents' request.  (Tr. 455:24–456:10; Ex. 7.)  The record illustrates that the Parents and Robertson had full participation in the CSE meeting even though DOE ultimately decided not to renew F.F.'s placement in the Rebecca School and instead suggested a 6:1:1 placement in public school.  *See, e.g.*, *T.P. ex rel S.P.*, 554 F.3d at 253 ("There is . . . evidence that the parents meaningfully participated in the July meeting, for example the Committee's adoption in the IEP of the parents' recommendations that Mamaroneck staff observe S.P. over the summer and meet with his home providers, and that Mamaroneck staff receive training on how to educate S.P.  We find that the parents meaningfully participated in the development of S.P.'s IEP . . . ."); *J.L.*, 2013 WL 625064, at *9 (finding that where the CSE accepted "nearly all of [the parents' expert] recommendations," except for "the recommendation for private school," there was no denial of a FAPE); *Dirocco ex rel. M.D.*, 2013 WL 25959, at *20 (noting that having the parents input at the meeting is sufficient even if all of the parents' recommendations are not adopted).  The Parents participated in the CSE, and F.F. was not denied a FAPE.

### iii.  Goals and Objectives

Plaintiffs argue that the SRO failed to adequately evaluate the goals and objectives in the IEP because:  (1) "The SRO failed to address [the Parents'] concern that the proposed IEP offered insufficient Goals and Objectives for F.F.," and (2) "the proposed IEP did not include the methods of measuring F.F.'s progress, as is required."  (Pls. Mem. 9–11.)  The SRO determined the goals were vague on their own but were clarified by the objectives and, as a unit, the goals and objectives did not deny F.F. a FAPE.  (SRO Decision at 17–19.)

In looking at the goals of an IEP, "what is required . . . is that the goals be designed both to 'meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum' and to 'meet each of the child's other educational needs that result from the child's disability.'" *C.H. v. Goshen Cent. Sch. Dist.*, No. 11-CV-6933, 2013 WL 1285387, at *12 (S.D.N.Y. Mar. 28, 2013) (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(II)); *see also Handberry v. Thompson*, 446 F.3d 335, 350 (2d Cir. 2006) ("[T]he IDEA requires that the IEP includes 'a statement of measurable annual goals, including academic and functional goals . . . .'" (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(II)(aa)-(bb)). "In this Circuit, courts are 'reluctant to find a denial of a FAPE based on failures in IEPs to [identify] goals or methods of measuring progress.'" *J.L.*, 2013 WL 625064, at *13 (quoting *P.K. v. N.Y.C. Dep't of Educ.*, 819 F. Supp. 2d 90, 109 (E.D.N.Y. 2011)); *R.R. v. Scarsdale Union Free Sch. Dist.*, 615 F. Supp. 2d 283, 295 (S.D.N.Y. 2009)); *see also J.A.*, 2012 WL 1075843, at *8 (S.D.N.Y. Mar. 28, 2012) ("[C]ourts in this district have held that similar omissions of [goals and objectives] on the IEP do not result in the loss of educational opportunity or lead to the denial of a FAPE."). "[A]s to the propriety of the goals themselves, deference to the reasoned conclusions of the SRO as the final state administrative determination is appropriate. Indeed, 'the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the [IDEA] requires deference to the expertise of the administrative officers.'" *C.H.*, 2013 WL 1285387, at *12 (alteration in original) (quoting *Grim*, 346 F.3d at 382); *see also A.D.*, 2013 WL 1155570, at *10 ("[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the administrative officers." (alteration in original) (quoting *Grim*, 346 F.3d at 382)); *J.L.*, 2013 WL 625064, at *13 ("The sufficiency of

goals and strategies in an IEP is quintessentially the type of issue on which deference to the expertise of administrative officers is appropriate.").

The SRO found that while the goals were vague, they were modified by more specific objectives that could be implemented.  (SRO Decision 17–20.)  She determined that the 12 annual goals "when considered by themselves, indicate[] they were vague and not measurable; however, the 26 short-term objectives in the IEP were related to and served to clarify the annual goals."  (*Id.* at 18.)  She further found that "[s]eventeen of the short-term objectives were detailed and measurable and addressed [F.F.'s] areas of need specific to pre-academic skills" and "nine short-term objectives addressed [F.F.'s] speech-language/communication abilities."  (*Id.*)  The SRO determined that "while [the] particular short-term objectives related to [F.F.'s] speech-language/communication areas of need were not measurable, . . . that such a procedural error did not impede [F.F.'s] right to a FAPE, significantly impede [the Parents'] opportunity to participate in the decision-making process regarding the provision of a FAPE to [F.F.], or cause a deprivation of educational benefits."  (*Id.*)

The cases in this Circuit demonstrate that "even where certain goals are overly broad, courts have found an IEP to be satisfactory where short-term objectives" are sufficiently detailed. *C.D. v. Bedford Cent. Sch. Dist.*, No. 10-CV-5502, 2011 WL 4914722, at *10 (S.D.N.Y. Sept. 22, 2011); *see also M.Z. v. N.Y.C. Dep't of Educ.*, No. 12-CV-4111, 2013 WL 1314992, at *6 (S.D.N.Y. Mar. 21, 2013) ("An IEP is not necessarily defective solely because the annual goals are stated in general terms, as long as those goals are supported with detailed short-term objectives."); *A.D.*, 2013 WL 1155570, at *11 ("The SRO found that 'the corresponding short-term objectives to [the] annual goals were detailed and measureable and therefore the structure and content in these short-term objectives sufficiently cured any deficiencies.'  The Court agrees

. . . ." (citations omitted)).  The Court has reviewed the record and agrees with the SRO that the goals are modified by more specific objectives in the IEP.  (Ex. B at 6.1–6.7.)  The IEP states that the goals will be reviewed three times in a year and the methods for assessment will be "teacher-made materials, observation, class participation," (Ex. B at 6.1–6.7, 9), which are sufficient to make the goals and objectives adequate.  *K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ.*, No. 11-CV-3733, 2012 WL 4017822, at *11 (S.D.N.Y. Aug. 23, 2012) (finding that the IEP was sufficient where it provided that the student would "be assessed using '[t]eacher made materials and observations'" and provided for "3 reports of progress this school year" (citations omitted)), *aff'd*, --- F. App'x ---, ---, 2013 WL 3814669 (2d Cir. July 24, 2013).

Furthermore, the testimony at the hearing was that F.F.'s goals were based on input from Robertson at the CSE meeting and reports from F.F.'s speech, OT and PT therapists at the Rebecca School.  (Tr. 227:3–8, 261:9–22.)  The goals were not very academic because F.F. was still developing pre-academic skills.  (Tr. 216:20–271:5.)  These skills cannot be measured through standardized tests.  (Ex. B. at 9.)  The drafters of the IEP wanted to leave teachers room to develop and model F.F.'s goals and objectives.  (Tr. 259:25–260:6, 429:14–433:23.)  These goals would most likely be measured through teacher and therapist assessment, such as "little progress made," goal met, and no progress made.  (Tr. 153:11–19, 157:21–158:5; Ex. B at 9.)  In fact, these same goals were measured by the Rebecca School using the same method — teacher and therapist observations and assessments.  (*See* Tr. 56:2–10; Ex. H at 5–10; Ex. J at 6–10.)  It is permissible for the CSE to determine goals based on the private school placement.  *J.L.*, 2013 WL 625064, at *14 ("Insofar as any listed goals may have been insufficiently specific, there was obviously no prejudice to the child's rights, since the CSE's ultimate recommendation for his classroom placements and support services, as memorialized in the IEP, is substantively identical

to, or even in excess of, what the parents deemed acceptable in the private school setting they preferred."). The record reflects that the goals in F.F.'s IEP were specifically tailored for the needs of F.F. given his academic level. *See, e.g.*, *M.Z.*, 2013 WL 1314992, at *10 ("This Court finds that the SRO's careful and considered analysis warrants deference and affirms the SRO's finding that no flaws in the goals resulted in denying the Student a FAPE."); *E.C. v. Bd. of Educ. of City Sch. Dist. of New Rochelle*, No. 11-CV-9429, 2013 WL 1091321, at *20 (S.D.N.Y. Mar. 15, 2013) ("The SRO's conclusion is supported by the record. Accordingly, Plaintiffs have failed to establish a procedural violation, let alone one which deprived J.C. of a FAPE."); *C.D.*, 2011 WL 4914722, at *9 ("The SRO specifically ruled that each of the annual goals addressed the student's needs and specified which type of service provider would be primarily responsible for implementing each goal with the student with respect to study skills, reading, mathematics, speech-language skills and social/emotional behavioral skills. The law requires no more."). The SRO's determination as to F.F.'s goals and objectives is supported by a preponderance of the evidence in the record and the SRO's determination is therefore affirmed.

### iv.  Assistive Technology

Plaintiffs argue that the IEP failed to provide F.F. with assistive technology for communication. (Pls. Mem. 11–12.) Plaintiffs assert that it was clear that F.F. was non-verbal at the time of the CSE, and while assistive technology was discussed at the meeting, the DOE failed to "hold any follow up meetings with F.F.'s parents to determine whether to offer assistive technology to F.F." (*Id.*) The SRO found that Fochetta specifically asked the Parents about assistive technology, but that it was not included in the IEP because the Parents reported that they were still having F.F. evaluated for assistive technology at the time. (SRO Decision 21.)

40

The SRO found that the IEP was based on the Rebecca School reports which did not mention assistive technology.  (*Id.*)

"The IDEA requires that a CSE in developing a student's IEP 'consider whether the child needs assistive technology devices and services.'"  *J.G. ex rel. N.G.*, 777 F. Supp. 2d at 647 (quoting 20 U.S.C. § 1414(d)(3)(B)(v)).  "On a case-by-case basis, the use of school-purchased assistive technology devices in a child's home or other setting is required if the child's IEP team determines that the child needs access to those devices in order to receive FAPE."  *J.C. ex rel. C. v. New Fairfield Bd. of Educ.*, No. 08-CV-1591, 2011 WL 1322563, at *18 (D. Conn. Mar. 31, 2011) (alteration omitted) (quoting 34 C.F.R. § 300.105(b)).  "An assistive technology device is 'any item, piece of equipment, or product system . . . that is used to increase, maintain, or improve the functional capabilities of a child with a disability.'"  *J.G. ex rel. N.G.*, 777 F. Supp. 2d at 647 (quoting 34 C.F.R. § 1401(1)(A)).  "[T]he IDEA does not require 'a school district to provide a specific program or employ a specific methodology in providing for the education of children with disabilities.'"  *H.C. v. Katonah-Lewisboro Union Free Sch. Dist.*, No. 09-CV-10563, 2012 WL 2708394, at *16 (S.D.N.Y. May 24, 2012) (citations omitted), *aff'd sub nom. H.C. ex rel. M.C. v. Katonah-Lewisboro Union Free Sch. Dist.*, --- F. App'x ---, 2013 WL 3155869 (2d Cir. June 24, 2013).  "[A]lthough assistive technology will almost always be beneficial, a school is only required to provide it if the technology is necessary.  Moreover, the failure to provide assistive technology denies a student FAPE only if the student could not obtain a meaningful benefit without such technology."  *J.C. ex rel. C.*, 2011 WL 1322563, at *18 (quoting *High v. Exeter Tp. School Dist.*, 2010 WL 363832, at *5 (E.D. Pa. Feb. 1, 2010)).

The record is clear that the reason assistive technology was not included in F.F.'s IEP is because the Parents stated at the CSE meeting that F.F. was still being evaluated for assistive

technology, and four days after the meeting, when the IEP was sent to the Parents, they had not informed the other members of the CSE of any change.  (Tr. 221:24–220:3, 258:16–19.) Furthermore, assistive technology had not been included in F.F.'s IEP in 2008–2009, (Ex. 1[18] at 1), and, thus, DOE had no notice on any substantive change on this issue.  Based on this evidence, the SRO found the failure to include assistive technology in the IEP did not amount to a denial of a FAPE.  (SRO Decision 21.)  The SRO's determination is supported by a preponderance of the evidence in the record and is affirmed.[19]  *P. ex rel. Mr. P. v. Newington Bd. of Educ.*, 512 F. Supp. 2d 89, 109 n.11 (D. Conn. 2007) ("The plaintiff alleges certain procedural deficiencies in the child's 2005–2006 IEP, particularly the failure to perform a timely behavioral assessment and an assistive technology evaluation.  However, as discussed above, evidence in the record suggests that school officials reviewed the need for these evaluations and the delay that occurred in performing them was not undue.  Even if a procedural deficiency existed, the Second Circuit has noted that not 'every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA.'" (quoting *Grim*, 346 F.3d at 381–382)), *aff'd sub nom. P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111 (2d Cir. 2008).

---

[18]  The exhibits from DOE are labeled by number, were submitted to the IHO and the SRO as part of the administrative hearing process and are labeled "Ex." hereinafter.

[19]  Plaintiffs assert that DOE had a duty beyond questioning the Parents about assistive technology at the CSE meeting, and at oral argument asserted that at a minimum, DOE should have done its own evaluation of F.F. for assistive technology.  (*See* Pls. Mem. 12; Pls. Opp'n to Def. Cross Mot. 17; Tr. 221:6–11; Oral Arg. Tr. 31:4–35:7.)  However, Plaintiffs have failed to provide any legal support for their argument that DOE had a duty beyond discussing assistive technology with the Parents at the CSE, especially where at the time of the IEP, there was no indication that F.F. was using an assistive technology device.

### v.  Parental Counseling and Training

Plaintiffs assert that the IEP was deficient because it failed to provide the Parents with parental counseling and training.  (Pls. Mem. 12–14.)  The SRO found that the omission of parent counseling and training from the IEP did not result in the denial of a FAPE to F.F. because (1) the State requires schools to provide parental counseling and training and thus, courts have found that it does not amount to the denial of a FAPE, and (2) the second placement provided parental counseling and training.  (SRO Decision 21–22.)  Plaintiffs argue that SRO could not rely on the counseling and training provided at the second placement since the training at the second placement school and Rebecca School were "incomparable" — at the Rebecca School, the Parents received counseling and training from an individually assigned social worker and at the second placement school there were monthly group workshops.  (Pls. Mem. at 13.)  The Court finds that under *R.E.*, a decision maker cannot rely on hearing testimony concerning what would have been offered at the placement school, and, therefore, the SRO's determination cannot be affirmed on that ground.  *R.E.*, 694 F.3d at 195 (holding that the "evaluation must focus on the written plan offered to the parents," and not speculation concerning what would or would not have been offered at the placement).[20]  However, the SRO was correct that state law provides for parental counseling and training and that the failure to provide for parent counseling and training in the IEP does not ordinarily, nor does it in this particular instance, amount to the

---

[20]  The Court notes, however, that the record does support the SRO's finding that parental counseling and training would have been provided at the second placement and was sufficient. Although not all the elements of the parent counseling and training at the second placement were the same as at the Rebecca School, both had daily journals between the parents and the teachers on the progress of the students and offered regular intervals for the parents to receive counseling and training, and, therefore, the SRO's determination that parental counseling and training at the second placement was sufficient is supported by the record.  (Tr. 70:5–23, 526:12–20.)

denial of a FAPE.  The Court affirms the SRO's determination that this procedural failure does not rise to the level of a FAPE violation.

"New York regulations require that an IEP provide for parent counseling and training for the parents of autistic children."  *R.E.*, 694 F.3d at 191; *see also FB v. N.Y.C. Dep't of Educ.*, No. 12-CV-1669, 2013 WL 592664, at *12 (S.D.N.Y. Feb. 14, 2013).  This means "assisting parents in understanding the special needs of their child; providing parents with information about child development; and helping parents to acquire the necessary skills that will allow them to support the implementation of their child's individualized education program."  *R.E.*, 694 F.3d at 191 (citations omitted); *see also FB*, 2013 WL 592664, at *12.  "Though the failure to include parent counseling in the IEP may, in some cases (particularly when aggregated with other violations), result in a denial of a FAPE, in the ordinary case that failure, standing alone, is not sufficient to warrant reimbursement."[21]  *R.E.*, 694 F.3d at 191; *M.W. ex rel. S.W.*, --- F.3d at ---, 2013 WL 3868594, at *7 ("[F]ailure to provide counseling ordinarily does not result in a FAPE denial or warrant tuition reimbursement."); *FB*, 2013 WL 592664, at *12 ("[W]hile a failure to provide parent counseling and training may — in combination with other deficiencies — *contribute* to denial of a FAPE, it alone is insufficient to rise to the level of denial thereof." (emphasis in original) (citations omitted)).

---

[21]  Since parental counseling and training is required by law regardless of its provision in the IEP, the Second Circuit has found that there are alternative remedies other than unilateral placement and reimbursement.  *M.W. ex rel. S.W.*, --- F.3d at ---, 2013 WL 3868594, at *7; *see also K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ.*, --- F. App'x ---, ---, 2013 WL 3814669, at *6 (2d Cir. July 24, 2013) ("Notably, 'because school districts are required by [New York law] to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP.  Parents can file a complaint at any time if they feel they are not receiving this service.'" (alteration in original) (quoting *R.E.*, 694 F.3d at 191)).

Here, the Parents had received counseling and training in the prior years and under New York law they could petition to have counseling and training at the second placement if it was not offered, thus, the lack of a specific provision on parental counseling and training does not amount to a denial of a FAPE.  *R.E.*, 694 F.3d at 193 ("[T]he failure to include parent training in the IEP did not rise to the level of a denial of a FAPE . . . ."); *FB*, 2013 WL 592664, at *13 (the lack of parental counseling in the IEP was not a denial of a FAPE); *M.M. ex rel. A.M. v. N.Y.C. Dep't of Educ. Region 9 (Dist. 2)*, 583 F. Supp. 2d 498, 509 (S.D.N.Y. 2008) ("[T]he SRO found that 'petitioners have received extensive parent training in the past and have been actively involved in their child's education, communicating regularly with her teachers and service providers.'  As the SRO's conclusion is supported by the record and the Plaintiffs have not offered any additional evidence to the contrary, the Court affirms the SRO's determination." (citations omitted)).

### vi.  Behavioral Needs

Plaintiffs allege that "[t]he SRO incorrectly reasoned that the DOE's failure to conduct a Functional Behavioral Assessment ('FBA') or develop a Behavior Intervention Plan ('BIP') for F.F. did not deny F.F. a FAPE."  (Pls. Mem. 14.)  The SRO relied on the testimony of Robertson to find that F.F.'s "behavior did not seriously interfere with instruction and could be addressed by the special education teacher and through support provided by [F.F.'s] OT, PT, and speech-language service provided."  (SRO Decision 25.)

Under New York state regulations, a FBA is required to be conducted "for a student 'whose behavior impedes his or her learning or that of others.'"  *R.E.*, 694 F.3d at 190 (quoting 8 N.Y.C.R.R. § 200.4(b)(1)(v)); *see also M.W. ex rel. S.W.*, --- F.3d at ---, 2013 WL 3868594, at *5–6; *FB*, 2013 WL 592664, at *9.  "The FBA includes 'the identification of the problem

behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior . . . and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it.'" *R.E.*, 694 F.3d at 190 (alteration in original) (quoting 8 N.Y.C.R.R. § 200.1(r)); *FB*, 2013 WL 592664, at *9. If based on the FBA, it is determined that a student's behavior impedes his learning, then a BIP should be developed "with strategies to deal with the problem behavior(s)." *R.E.*, 694 F.3d at 190; *FB*, 2013 WL 592664, at *9.

However, the IDEA does not specifically require an FBA but "only requires a school district to 'consider the use of positive behavioral interventions and supports, and other strategies' when a child's behavior impedes learning." *M.W. ex rel. S.W.*, --- F.3d at ---, 2013 WL 3868594, at *5 (citations omitted). "Failure to conduct an FBA, therefore, does not render an IEP legally inadequate under the IDEA so long as the IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior." [22] *M.W. ex rel. S.W.*, --- F.3d at ---, 2013 WL 3868594, at *6; *see also A.D.*, 2013 WL 1155570, at *9 ("Even if a student's behavior does impede a child's learning or that of others, the Second Circuit has held that the failure to conduct an FBA 'does not compel the conclusion' that the IEP developed was 'legally inadequate,' so long as the government complies with its obligation to 'consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior.'" (quoting *A.C. ex rel. M.C.*, 553 F.3d at 172)). "An FBA omission does, however, cause [courts] to 'take particular care to ensure that the IEP adequately addresses the child's problem

---

[22] While the Second Circuit in *R.E.* went one step further and held that the omission of the FBA is a procedural violation, *R.E.*, 694 F.3d at 19, it is clear that in both *M.W. ex rel S.W.* and *R.E.* the omission of a FBA only amounts to the denial of a FAPE if there are no mechanisms in the IEP to address interfering behavior. *R.E.*, 694 F.3d at 19 (The "failure to conduct an FBA is a procedural violation, but . . . it does not rise to the level of a denial of a FAPE if the IEP adequately identifies the problem behavior and prescribes ways to manage it.").

behaviors.'"  *M.W. ex rel. S.W.*, --- F.3d at ---, 2013 WL 3868594, at *5 (quoting *R.E.,* 694 F.3d at 190).

The SRO found that the hearing record demonstrated that F.F.'s "behavior did not seriously interfere with instruction and could be addressed by the special education teacher and through support provided by [F.F.'s] OT, PT, and speech-language providers," and therefore, a BIP was not required.  (SRO Decision 25.)  In making her determinations that F.F.'s behavior did not interfere with his learning and could be addressed by his special education teacher and therapists, the SRO relied on the testimony of Fochetta, Robertson and F.F.'s therapists (Kimmelan and Sheridan), all of whom testified that teachers and therapists were able to handle F.F.'s dysregulation by primarily relying on sensory tools.  (*Id.*)  The SRO's determination is supported by the record.  Since F.F. had not been aggressive toward others, the CSE members believed that his issues could be properly handled by his special education teacher, his personal paraprofessional and his therapists, and determined that a FBA and BIP were not necessary.  (Tr. 454:23–455:10, 488:10–14; *see also* Tr. 135:6–25.)  Robertson, Kimmelan and Sheridan testified that F.F. needed sensory stimulus when he became dysregulated or upset.  (Tr. 413:7–24, 425:13–426:3, 451:20–452:6.)  The IEP specifically provided for sensory stimulus, one-on-one adult support, and an adaptive chair.  (*See* Ex B at 3–4.)  The IEP also noted that generally, F.F.'s issues can be addressed by his special education teacher.[23]  (*Id.* at 4.)  The absence of an FBA does not render an IEP procedurally inadequate, since as described above, the IEP did consider behavioral strategies, such as sensory tools and an adaptive chair to address F.F.'s behavior.  *See, e.g.*, *A.C. ex rel. M.C.*, 553 F.3d at 172 (holding that the "IEP adequately addressed [the student's] behavior" despite not having a FBA); *A.D.*, 2013 WL 1155570, at *10

---

[23]  While the second placement did not have all the same tools and equipment that the Rebecca School had, it did have sensory tools.  (*See* Tr. 60:5–18.)

("Because the CSE considered the [student's] behavioral difficulties and recent improvement and ultimately concluded that her behavior did not impede her learning or that of others, the failure to conduct an FBA and a BIP was not procedural violation."); *C.B. v. Pittsford Cent. Sch. Dist.*, No. 08-CV-6462, 2010 WL 1533392, at *16 (W.D.N.Y. Apr. 15, 2010) ("The Court . . . determines that [the defendant's] decision not to conduct an FBA did not render the IEPs procedurally or substantively deficient, since the IEPs contained various strategies to motivate EB and to address his behaviors.").

### vii. Cumulative Procedural Errors

As discussed above, none of the alleged procedural errors individually rendered the IEP inadequate.  The Court also finds that they do not render the IEP inadequate when considered cumulatively.  "Relief is warranted only if the alleged procedural inadequacies '(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of [a FAPE] to the parents' child; or (III) caused a deprivation of educational benefits.'"  *M.H.*, 685 F.3d at 245 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).  To state it differently, an IEP will only be found inadequate when "procedural inadequacies that individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP constitute a denial of a FAPE."  *E.C.*, 2013 WL 1091321, at *19 (citations omitted); *see also Dirocco ex rel. M.D.*, 2013 WL 25959, at *16 (using the same standard); *M.S. v. N.Y.C. Dep't of Educ.*, No. 09-CV-4454, 2010 WL 9446052, at *18 (S.D.N.Y. Mar. 12, 2010) ("Only procedural inadequacies that cause substantive harm to the child or his parents — meaning that they individually or cumulatively result in the loss of educational opportunity or seriously infringe on

a parent's participation in the creation or formulation of the IEP — constitute a denial of a

FAPE." (alteration and citations omitted)).

Plaintiffs cite as procedural errors the composition of the CSE, the IEP program

recommendation, the lack of measurable goals, assistive technology, parent counseling and

training, and a BIP based on a FBA. (Pls. Mem. 6–16.) However, even viewing these alleged

errors cumulatively, they did not prevent the Parents from fully participating in the CSE nor do

they amount to a denial of a FAPE. The Parents participated in a CSE the year prior to their

participation in the CSE challenged in this action, to develop an IEP for F.F. for the 2008–2009

school year when the DOE determined that the Rebecca School was the proper placement for

F.F. (*See* Pls. 56.1 ¶¶ 9, 11 (discussing the prior year's IEP); Def. 56.1 ¶¶ 6, 26 (same); Ex. 1 at

2 (F.F.'s 2008–2009 IEP listing the Parents as attendees).) Thus, the Parents knew what an IEP

was and they knew what a CSE entailed. (*See* 56.1 Pls. ¶¶ 9, 11; Def. 56.1 ¶¶ 6, 26.) While

Plaintiffs did not have another parent member on the CSE for the 2009–2010 school year CSE

meeting, Plaintiffs had the support of F.F.'s then special education teacher, Robertson. (Tr.

456:15–23.) The Parents and Robertson fully participated in the CSE. (Tr. 219:20–220:3,

222:23–223:3, 224:21–23, 258:16–19, 483:22–484:1, 531:23–532:7.) E.F. testified that she

made suggestions, at least one of which made it to the IEP. (Tr. 510:13–23, 511:10–21, 531:23–

532:7.) The IEP included speech therapy, OT and PT, all of which F.F. was receiving at the

Rebecca School, and included a one-on-one paraprofessional, which F.F. was already receiving

at the Rebecca School but was being provided for by DOE. (Ex. B.) The goals and objectives

for the advancement of F.F. were discussed at the CSE and included in the IEP, (Tr. 455:24–

456:10), and were based on the reports from F.F.'s teachers and therapist at the Rebecca School,

so that F.F. could continue to make educational progress. (Tr. 227:3–8, 261:9–22.)

Plaintiffs cannot show that F.F. was denied a FAPE.  First, as discussed above, many of the alleged procedural errors were not errors, including Plaintiffs' claims that there was no one on the CSE to interpret the implications of F.F.'s evaluation results, that the 6:1:1 placement was inadequate, that the IEP failed to provide assistive technology, and that the IEP failed to include a BIP based on a FBA. The only procedural errors are (1) the absence of a parent member from the CSE meeting, (2) arguably, the vague goals which were defined by the objectives, and (3) the absence from the IEP of parent counseling and training.  As discussed above, the purpose of these three requirements were nevertheless met since the Parents participated in the CSE meeting despite the lack of another parent member, the vague goals were defined by the objectives and were based on the goals and objectives for F.F. at the Rebecca School, and the Parents would have obtained parent counseling and training because it is mandated by New York law and, in addition, they had obtained training in the past.  Thus, when considered cumulatively, these procedural errors did not deprive F.F. of a FAPE.  Additionally, even if the Court considers Plaintiffs' other claims in the cumulative analysis — which claims the Court finds are not procedural deficiencies — Plaintiffs still cannot show that F.F. was denied a FAPE.

The actual procedural errors — the absence of a parent member from the CSE, the vague goals which were defined by the objectives, and the absence of parent counseling and training — were procedural errors of "form over substance" and did not render the IEP legally inadequate under the IDEA as they did not rise to the level of any of the three categories identified by the Second Circuit as warranting a conclusion that the IEP was fundamentally deficient.  *See, e.g.*, *R.E.*, 694 F.3d at 193 ("[W]e conclude that the failure to include parent training in the IEP did not rise to the level of a denial of a FAPE, even when considered cumulatively with the deficiencies in the FBA."); *FB*, 2013 WL 592664, at *13 (the lack of parental counseling, in

addition to the lack of a FBA and BIP along with other procedural errors, did not "cumulatively" result in the denial of a FAPE since the errors were "more formal than substantive").

### c. Substantive Deficiencies

Having considered Plaintiffs' claims of procedural deficiencies and finding them to be without merit, the Court now turns to Plaintiffs' claims of substantive errors.  In reviewing IEPs for substantive deficiencies, courts "examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits. Substantive inadequacy automatically entitles the parents to reimbursement." *R.E.*, 694 F.3d at 190 (alterations, citations and internal quotation marks).  "The IDEA does not require schools to provide the very best educational opportunities and services possible, as the purpose of the IDEA is 'more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.'" *J.C. ex rel. C.*, 2011 WL 1322563, at *19 (quoting *Rowley*, 458 U.S. at 197 n.21).  The IDEA "does not require schools to provide 'everything that might be thought desirable by loving parents,' but rather only a 'basic floor of opportunity,'. . . ." *C.H.*, 2013 WL 1285387, at * 16. (quoting *Rowley*, 458 U.S. at 201; *Walczak*, 142 F.3d at 132).

Plaintiffs challenge DOE's determination that F.F. should be placed in a 6:1:1 special class.  (Pls. Mem. 16–17.)  Plaintiffs also challenge the second placement, listing the reasons it was inadequate as: (1) it required F.F. to attend class in a "small trailer" temporarily; (2) the sensory gym was on the second floor and F.F. cannot climb stairs; (3) the sensory gym and therapy rooms lacked adequate equipment; (4) "[b]eginning in September, 2009, [the second placement]  could not fulfill all of its students' PT and OT mandates" and it was possible that F.F. would not receive his OT and PT until October; (5) the staff did not know American Sign

51

Language; and (6) it would provide only "10 minutes of 1:1 instruction per student" which was "grossly inadequate." (*Id.* at 17–23.) Plaintiffs also claim the second placement (a) "could not guarantee the availability of full-time support from an Orientation and Mobility Paraprofessional, as indicated in F.F.'s IEP" and (b) it "did not offer sufficient parent training." (Pls. 56.1 ¶ 22.) The SRO found that the 6:1:1 class was appropriate for F.F., the second placement would have been able to implement the IEP and, as a whole, the IEP was substantively adequate. (SRO Decision 25–30.)

First, the SRO only considered the program outlined for F.F. in the IEP once in her decision.[24] As discussed in the "Continuum of Programing" section, the SRO found that the IEP as written was the least restrictive program to give F.F. a FAPE. (*See supra* Part II.c.ii.1.). As discussed above, the SRO's determination is supported by a preponderance of the evidence in the record. (*See id.*)

Second, regarding Plaintiffs' challenges to the second placement, the SRO noted that IEPs are to be determined on the merits of the IEP, not on its possible implementation, and many of the Parents challenges were speculative. (SRO Decision 26.) According to the Second Circuit, the Court's "evaluation must focus on the written plan offered to the parents . . . . Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." *R.E.*, 694 F.3d at 195. The Second Circuit has held that:

> Restrictions on the use of retrospective evidence are rooted in the principle that parents must be able to decide rationally whether to accept a proffered public school placement or to send their child, at the risk of non-reimbursement, to private school. In most cases, parents make this difficult decision on the basis of the IEP.

---

[24] As referenced in the procedural challenges discussion of the "Continuum of Programing" section, the program in the IEP is normally considered a substantive and not a procedural issue. (*See supra* Part II.c.ii.1.)

> Accordingly, at this moment of parental decision-making, the IEP
> must offer the student a FAPE on its own terms.

*K.L. ex rel. M.L.*, --- F.3d at ---, 2013 WL 3814669, at *4.

Plaintiffs argued at oral argument that their concerns are not speculative since they visited the school and had direct knowledge of some of the difficulties F.F. would have encountered had they accepted the second placement.  (Oral Arg. Tr. 5:16–6:5.)  The SRO noted that "the hearing record in its entirety does not support the conclusion that had [F.F.] attended the [second placement], [DOE] would have deviated from substantial or significant provisions of [F.F.'s] IEP in a material way and thereby precluded [F.F.] from the opportunity to receive educational benefits."  (SRO Decision 26.)  The SRO found that based on the hearing testimony, the 6:1:1 program at the second placement would have been suitable for F.F., a one-on-one paraprofessional would have been provided, OT services would have been provided and the staff knew sufficient sign language.  (*Id.* at 26–30.)

The Second Circuit has held that while "[a] school district cannot rehabilitate a deficient IEP after the fact by relying on testimony that 'effectively amends or fixes' a deficient IEP 'by showing that the child would, in practice, have received the missing services . . . . testimony may be received that explains or justifies the services listed in the IEP."  *K.L. ex rel. M.L.*, --- F.3d at ---, 2013 WL 3814669, at *4 (citations and internal quotation marks omitted).  Tellerman testified that if F.F. had attended the second placement, adjustments would have been made to ensure that his IEP was appropriately implemented.  (Tr. 74:3–80:23.)  F.F.'s classroom would have been moved to the first floor, inside of the building.  (Tr. 31:8–33:19.)  There were first floor therapy rooms that could have been used for F.F.'s therapy and sensory needs.  (Tr. 45:18–46:1.)  He would have been provided a paraprofessional who would have been directed by the teacher to help F.F. with his lessons.  (Tr. 25:10–14, 95:6–16.)  While no one at the school was

fully conversant in American Sign Language, the staff all knew the same basic signs as the signs F.F. was learning at the Rebecca School. (Tr. 80:10–15, 173:9–24; 176:2–19, 381:14–383:1, 493:24–494:5.) There was additional testimony by Tellerman that the second placement also offered a range of programs that F.F. enjoyed at the Rebecca School, including OT, PT, speech therapy, music lessons and art lessons. (Tr. 38:4–21, 40:22–42:14, 62:17–63:1, 73:10–14.) Although different than what was provided at the Rebecca School, there were multiple items available for sensory stimulus of the students. (Tr. 60:5–18.) The Court must give deference to the SRO's determination that the IEP would have been adequately implemented, since it is based on a preponderance of the evidence in the record and the Court is required to give deference to the SRO's credibility determination of the various witnesses. *M.H.*, 685 F.3d at 240 ("District courts are not to make 'subjective credibility assessment[s],' and cannot 'ch[oose] between the views of conflicting experts on . . . controversial issue[s] of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence.'" (alteration in original) (citation omitted)). The Court affirms the SRO's findings that the IEP and the placement were substantively sufficient as the SRO's findings are supported by a preponderance of the evidence in the record.

Since the IEP neither denied F.F. a FAPE because of procedural or substantive deficiencies, the Court affirms the SRO's decision *See, e.g.*, *G.W. v. Rye City Sch. Dist.*, No. 11-CV-8208, 2013 WL 1286154, at *25 (S.D.N.Y. Mar. 29, 2013); *H.C.*, 2012 WL 2708394, at *18; *E.M.*, 2011 WL 1044905, at *10.

**III.   Conclusion**

For the reasons discussed above, Plaintiffs' motion for summary judgment is denied and

DOE's cross-motion for summary judgment is granted.

SO ORDERED:


_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated:  August 19, 2013
           Brooklyn, New York

55